IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEX LEVY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 19-23 |
| UNITED PARCEL SERVICE, | : | |
| Defendant. | : | |

# **MEMORANDUM OPINION**

This personal injury action arises out of a motor vehicle accident in which Plaintiff Alex Levy ("Levy") contends that, while operating a van on the Pennsylvania Turnpike ("Turnpike"), he was struck from behind by Defendant United Parcel Service's ("UPS") tractor-trailer and that the tractor-trailer operator did not stop at the scene of the accident.[1] Pl.'s Br. (Doc. No. 33) at 5-6. UPS has filed a Motion for Summary Judgment (Doc. No. 30) seeking dismissal of this case on the ground that Levy cannot establish that any of its vehicles were involved in the accident at issue. Def.'s Br. (Doc. No. 30-2) at 3. Because the Court finds that a genuine issue of material fact exists as to whether a UPS vehicle was involved in the accident, UPS' Motion will be denied.

---

[1] In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the undersigned United States Magistrate Judge conduct proceedings in this case, including the entry of final judgment. See Doc. Nos. 14, 15.

(Footnote continued on next page)

**I.     FACTUAL BACKGROUND**[2]

On December 17, 2016, Levy was operating a van on the Turnpike when he was struck from behind by a tractor-trailer. Pl.'s Br. at 5-6; Def.'s Br. at 3.[3] The collision caused Levy's van to strike the center concrete barrier and then to ricochet across three lanes of traffic to finally come to rest on a grass embankment. Pl.'s Br. at 6. The driver of the tractor-trailer did not stop at the scene of the accident. Id.; Def.'s Br. at 4. Levy testified at deposition that he first noticed the tractor-trailer, which he identified as a UPS vehicle, when it was about one-half mile behind him. Pl.'s Br. Ex. B, at 16. He testified further that he was traveling in the center lane while the UPS vehicle, which was in the left lane, began to overtake him. See id. at 16-17. He stated that the road conditions were icy and that freezing rain was still falling at the time of the accident. Def.'s Br. Ex. J, at 95. Levy also testified that, when he spoke to the police two weeks after the accident, they informed him that there had been 12 other accidents in the same area on the same day. Id. Levy estimated that the UPS vehicle was traveling at least 60 miles per hour, Pl.'s Br. Ex. B, at 16, but that "none of the other cars, other than this UPS vehicle, was doing over 45 miles per hour," Def.'s Br. Ex. J, at 96. He testified that, when the UPS vehicle was approximately five to 10 feet behind him, it abruptly swerved into the middle lane and struck his van from behind. Pl.'s Br. Ex. B, at 16-17; Def.'s Br. Ex. J, at 97. The collision caused Levy to lose control of his van, and caused the van to spin two to three times until it collided with the center barrier. Def.'s Br. Ex J, at 98. The van then bounced off that barrier and started spinning

---

[2] Each party has included their statement of facts in the body of their briefs, rather than as a separate document. Citations to the parties' briefs will be to the page numbers generated by the Court's Electronic Case Filing System.

[3] For purposes of the present Motion, UPS does not contest Levy's version of how the accident occurred. UPS asserts, however, that the tractor-trailer involved in the accident was not a UPS vehicle.

again until it wound up on the grass at the side of the road. Id. Levy testified that he lost consciousness during these events and only awakened after his van had come to rest on the grass. Id. A neurologist who examined Levy four days after the accident concluded that Levy had suffered a concussion. Id. Ex. N, at 122-23. Levy testified that the driver of the tractor-trailer did not stop at the scene of the accident. Id. Ex. J, at 99. Levy stated that he knew that the tractor-trailer that struck him was a UPS vehicle because "it was brown. It said UPS on the side and front." Pl.'s Br. Ex. B, at 16. He also testified that the driver was wearing "one of those brown UPS caps." Id. He explained that he had identified the tractor-trailer as a UPS vehicle because he had frequently seen UPS trucks before. Id. at 17.

The accident occurred at mile marker 327 on the Turnpike in the eastbound lanes, which is approximately 15 miles before the Willow Grove exit. Pl.'s Br. at 5-6; Def.'s Br. at 4. UPS has a distribution center that is accessed via the Willow Grove exit and is approximately two miles from that exit. Def.'s Br. at 4. Both parties have attached to their briefs a copy of the Willow Grove distribution center's dispatch logs for the date in question. Pl.'s Br. Ex. C; Def.'s Br. Ex. E. Although the dispatch logs contain a significant amount of coded information, and neither party has provided any means of interpreting the coding, they both agree that the relevant entry is for a truck that arrived at the Willow Grove distribution center at 9:55 a.m. driven by UPS driver David Mayfield ("Mayfield").[4] Pl.'s Br. at 7-8 & Ex. C, at 20; Def.'s Br. at 5 & Ex. E, at 43. Levy asserts that the timing of Mayfield's arrival at the Willow Grove distribution center is consistent with the time and location of the accident. Pl.'s Br. at 7-8. UPS does not challenge that assertion, and it admits that Mayfield was travelling eastward from Harrisburg,

---

[4] Levy identifies the UPS driver as Henry Mayfield, Pl.'s Br. at 7, while UPS identifies the driver as David Mayfield, Def.'s Br. at 5. That difference is not material to the decision on UPS' summary judgment motion.

3

Pennsylvania and that he arrived at the Willow Grove distribution center at 9:55 a.m. on the date in question. See Def.'s Br. at 5.

UPS, however, argues that none of its drivers had reported to its dispatcher at its Willow Grove facility that they had been involved in an accident on the Turnpike on the date of the accident. Id.; see also id. Ex. L, at 112 (Deposition of Rosemary Myers—UPS' Willow Grove dispatcher). UPS also asserts that the maintenance records for Mayfield's truck do not reflect any repairs to its front bumper. Id. at 5 & Ex. F (maintenance record from December 1, 2016 through January 31, 2017). UPS contends that, in addition to the maintenance records for Mayfield's truck, its maintenance records for its fleet of vehicles in the Philadelphia/Chesapeake region for the two weeks after the accident reveal only one repair to the front bumper for any of those trucks and that the vehicle involved was not in the vicinity of the accident. Id. at 5 & Ex. G. UPS also points to the fact that its list of incident reports involving its vehicles did not include one for Levy's accident. Id. at 6 & Ex. H. Levy has not contested any of these assertions.

## II. SUMMARY JUDGMENT STANDARD

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

4

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006). To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

### III.  DISCUSSION

In the present case, UPS contends that Levy has provided insufficient evidence to raise a genuine issue regarding whether his van was struck by a UPS vehicle. Def.'s Br. at 9-12. UPS

argues that the only evidence that Levy has presented are his own "bald allegations" and that

"the Court cannot credit" such "allegations" at the summary judgment stage.[5] Id. at 10-11. That

argument, however, overstates the controlling precedent. As one judge in this District has

explained:

> [a]s a general proposition, 'conclusory, self-serving affidavits are insufficient to
> withstand a motion for summary judgment. *Gonzalez v. Sec'y of the Dep't of
> Homeland Sec.,* 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie,
> McCamey & Chilcote, P.C.,* 560 F.3d 156, 161 (3d Cir. 2009)). This rule has been
> extended to self-serving deposition testimony. *Irving v. Chester Water Auth.,* 439
> Fed. Appx. 125, 127 (3d Cir.2011). However, the issue is not whether Plaintiff
> has relied solely on his own testimony to challenge the Motions, but whether
> Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a
> rational factfinder to credit Plaintiff's testimony, despite its self-serving
> nature. *See Gonzalez,* 678 F.3d at 263.

Johnson v. MetLife Bank, N.A., 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012); accord Jordan v.

Cicchi, No. 10-4398, 2014 WL 2009089, at *2 (D.N.J. May 16, 2014); Butler v. BTC Foods,

Inc., No. 12-0492, 2014 WL 336649, at *4 (E.D. Pa. Jan. 30, 2014).

In addition to urging this Court to adopt a categorical position that a party's self-serving

testimony cannot defeat summary judgment, UPS raises arguments regarding why it believes that

no rational factfinder could credit Levy's deposition testimony. See Def.'s Br. at 9-12. None of

those arguments however, present a valid basis for granting summary judgment.

---

[5] UPS cites to Federal Rule of Civil Procedure 56 for the proposition that "[a] party who opposes a properly supported summary judgment motion may not merely rely on his pleadings, but must set forth specific facts, through affidavits, depositions, answers to interrogatories, or admissions, that show there is a genuine issue for the trier of fact to resolve." Def.'s Br. at 9. Thus, by that rule's own terms, deposition testimony is not a "bald allegation[]" but is the type of evidence on which a plaintiff may rely to establish a genuine issue of material fact. See Fed. R. Civ. P. 56(c)(1)(A); see also Page v. Doyle, No. 18-609, 2019 WL 1790467, at *5 (E.D. Pa. Apr. 24, 2019). Indeed, Rule 56 even permits a party to raise a genuine factual dispute based on affidavits, "including those made for purposes of the motion only," despite the fact they are not subject to cross-examination.

UPS first argues that Levy's deposition testimony cannot be credited because the documents that it provided in discovery and the deposition testimony of its employees do not support Levy's assertion that the truck that struck his van belonged to UPS.  Id.  It notes that none of its drivers reported to its Willow Grove dispatcher that they had been involved in an accident on the Turnpike.  Id. at 5.  UPS also points to its maintenance records, which do not show that Mayfield's truck, or any of UPS' other trucks, had repairs performed to their front bumpers at or around the time in question.  Id.  Moreover, UPS' incident reports do not include any report regarding Levy's accident, id. at 6, and the depositions of Mayfield and UPS' "on the road supervisor," Maurice Harris ("Harris"), provide no evidence to support Levy's claim, id. at 9-10.

While these documents may well prove persuasive to a jury, they would not prevent a rational juror from finding Levy's testimony credible.  UPS does not dispute for the purposes of the present Motion that Levy was the victim of a "hit and run" accident.  Harris testified at deposition that a UPS driver who failed to report an accident would be terminated from UPS' employ.  Pl.'s Br. Ex. D, at 27-28.  Even if a UPS driver reported an accident, when the accident resulted in the driver being issued a citation, and one of the parties involved is taken to a hospital, as was the case here, the driver would be suspended and could be fired.  See id. at 39-42.  In that event, the driver also would be drug-tested.  Id. at 42.  In light of these facts, it is within the purview of the jury to determine whether a significant motive might exist for a UPS driver to deny any involvement in the accident at issue.

Furthermore, if Mayfield was the driver who rear ended Levy's van, it is not entirely clear that UPS personnel would know of it or that its records would reflect it.  Harris testified that the only way UPS would know that one of its drivers was involved in the accident would be

7

if the driver reported the accident to it or if the truck showed "fresh damage." Id. at 38. UPS maintains that Levy's version of the accident is contradicted by the fact that Mayfield's truck was not found to have damage to its front bumper. Def.'s Br. at 5, 10. While this evidence may be probative regarding whether Mayfield was involved in Levy's accident, it is not necessarily inconsistent with Levy's testimony. The record reflects that Levy's van was struck from behind by a tractor-trailer and that road conditions were icy and dangerous at the time of the accident. Id. Ex. J, at 95. Levy testified that he was travelling at the speed of traffic, which was approximately 45 miles per hour, id. at 96, while the tractor-trailer was overtaking him travelling at least 60 miles per hour, Pl.'s Br. Ex. B, at 16. He testified that the tractor-trailer was merging into his lane from the left lane when it struck his van from behind. Def.'s Br. Ex. J, at 96-98. The summary judgment record is devoid of any evidence to show with how much force the tractor-trailer struck Levy's van, what degree of force would be required to cause a van driving in icy conditions to go into a spin, and what the relative heights of the two vehicles' bumpers were. Thus, it is for a jury to decide whether a van driving on icy roads could be forced into a spin by contact from behind by a tractor-trailer and whether that impact could cause visible or significant damage to the much larger vehicle.

UPS further argues that the evidence contradicts Levy's testimony because pictures of Levy's van taken after the accident did not show any brown paint from Mayfield's truck directly on the van's rear bumper. Def.'s Br. at 6 (citing id. Ex. I). However, given the discrepancy in height and size of the two vehicles and the icy conditions that existed at the time of the accident, in the absence of expert testimony, the evidence does not establish that the collision would have necessarily left brown paint on Levy's van.

UPS next maintains that a rational juror could not credit Levy's testimony because, when asked whether its truck's trailer was painted brown, he replied "I believe it was brown with the UPS emblem on there." Id. Ex. J, at 97. The trailer on Mayfield's vehicle was silver colored. Id. Ex. K. The record in this case reflects that the tractor-trailer approached Levy from behind while he was driving in icy conditions and then abruptly swerved into his lane and struck him from behind. Under these circumstances, Levy may have had little opportunity to see the trailer part of the vehicle and little reason to focus on its color. The collision caused him to spin a few times, strike the median barrier and then ricochet in a spinning fashion across three lanes of traffic. Id. Ex. J, at 97-98. Levy testified that he struck his head repeatedly on the steering wheel and the side of his vehicle and lost consciousness in the process. Id. at 98. Because the tractor-trailer driver did not stop at the accident scene and Levy claims to have lost consciousness, Levy may not have had any further opportunities to observe the trailer of that vehicle. A neurologist who examined Levy four days after the accident confirmed that he had suffered a concussion. Id. Ex. N, at 123. The neurologist also found that Levy had suffered "significant strain and sprain of his paracervical and trapezius muscles." Id. Levy testified that he also suffered damage to his C3 through C7 vertebrae, as well as a torn ligament and tendon in his right foot. Id. Ex. J, at 100. Thus, even if Levy had seen that the trailer was painted silver rather than brown, a reasonable juror could find that he might have forgotten that fact in light of the traumatic nature of the incident and his alleged concussion and other serious injuries.

UPS also emphasizes that neither the report from the ambulance that took Levy to the hospital, nor the examination report of the neurologist, recorded that the truck that struck Levy's van was a UPS truck. Def.'s Br. at 7. Given Levy's alleged condition at the time, it is not clear that he would have bothered to identify the tractor-trailer that struck him, or that even if he did,

9

that the emergency services personnel in the ambulance would have felt it necessary to record that information. Similarly, when Levy visited a neurologist four days after the accident, he alleges that he was still suffering the effects of a concussion as well as significant pain in his neck, back and ankle. See id. Ex. J, at 99-100 & Ex. N. Levy testified that, during the week after the accident, he was traumatized and light-sensitive and that all he was concerned with was rest. Id. Ex. J, at 99. He stated that he "wasn't even thinking about any type of lawsuits, anything of that nature." Id. Both the emergency services personnel and the neurologist examined Levy to identify and treat his injuries and not for the purpose of making a record for litigation. It is not at all clear that, even if Levy had told them that the tractor-trailer that struck him was a UPS vehicle, they would feel it necessary, or even relevant, to record that fact. While UPS may argue to a jury that it is probative that neither the ambulance crew nor the neurologist specified that the tractor-trailer that struck Levy was a UPS truck, a rational juror could find that this fact is not necessarily inconsistent with Levy's testimony.

Finally, UPS contends that the fact that Levy did not contact the police to give a report of the accident until two weeks after it occurred is yet another indication that a UPS vehicle was not involved in the accident.[6] Def.'s Br. at 7, 10. Here, Levy testified that prior to contacting the police, he had been focused on resting and recovering from his alleged concussion and other significant physical injuries and that he "wasn't even thinking about any type of lawsuits,

---

[6] UPS asserts that Levy only spoke to the police when they contacted him, citing the police report regarding the accident. Def.'s Br. at 7 (citing id. Ex. D). That assertion is inaccurate. Levy testified that he initially contacted the police to inquire about "what [he] could do about the situation because [he] ha[d not] heard anything back to that point." Id. Ex. J, at 99. The police report that UPS cites does not state that the police officer contacted Levy first but only that Levy "was interviewed by telephone." Id. Ex. D, at 38. Levy testified that when he called the police, he was informed that the officer involved would call him back. Id. Ex. J, at 99. Thus, the police report does not contradict Levy's testimony.

10

anything of that nature. [He] just wanted to get [his] head together." Id. Ex. J at 99. The record in this case is devoid of any evidence regarding Levy's legal sophistication or experience with prior accidents. While UPS may question the veracity or wisdom of Levy's conduct, its argument would not prevent a rational juror from crediting his testimony.

## IV. CONCLUSION

For the foregoing reasons, this Court finds that a genuine issue of material fact exists regarding whether a UPS vehicle was involved in the accident at issue. Accordingly, UPS' Motion for Summary Judgment will be denied. An appropriate Order follows.

Dated: February 18, 2020

BY THE COURT:

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE